GEORGE W. JACKSON MENTAL HEALTH CENTER, et al
*v.* Elaine LAMBIE

CA 94-620 898 S.W.2d 479

Court of Appeals of Arkansas
Division II
Opinion delivered May 24, 1995
[Rehearing denied June 28, 1995.]

*Richard S. Smith*, for appellant Public Employee Claims Division.

*Bill W. Bristow*, for appellee.

MELVIN MAYFIELD, Judge. In this worker's compensation case the appellee's husband, an employee of appellant, committed suicide on January 11, 1992. The administrative law judge held that the death was not compensable because of Ark. Code Ann. § 11-9-401(a)(2) (1987), which provides:

However, there shall be no liability for compensation

under this chapter where the injury or death from injury was substantially occasioned by intoxication of the injured employee or by willful intention of the injured employee to bring about the injury or death of himself or another.

The Commission reversed the law judge and held that "work-related stress caused the decedent to commit suicide." Appellant, Public Employee Claims Division, argues that (1) the Commission erred in finding that the decedent's suicide arose out of, and in the course of, his employment and (2) the Commission erred in holding that the claim is not barred by Ark. Code Ann. § 11-9-401(a)(2) (1987).

■ When reviewing a decision of the Workers' Compensation Commission, we view the evidence and all reasonable inferences deducible therefrom in the light most favorable to the findings of the Commission and affirm that decision if it is supported by substantial evidence. *Clark* v. *Peabody Testing Service*, 265 Ark 489, 579 S.W.2d 360 (1979). The weight and credibility of the evidence is exclusively within the province of the Commission. *Morrow* v. *Mulberry Lumber*, 5 Ark. App. 260, 635 S.W.2d 283 (1982). The issue is not whether we might have reached a different result or whether the evidence would have supported a contrary finding; if reasonable minds could reach the Commission's conclusion, we must affirm its decision. *Bearden Lumber Company* v. *Bond*, 7 Ark. App. 65, 644 S.W.2d 321 (1983).

There was evidence that Michael G. Lambie, age 44, had obtained what was called a Specialist degree, between a Master's and a Doctorate degree, from Arkansas State University, in rehabilitation counseling. He had worked at the Arkansas Services Center rehabilitating alcoholics until that facility closed. He then went to work for appellant, George W. Jackson Mental Health Center, in Jonesboro. Lambie was described by his wife and co-workers as compulsive and a perfectionist, as well as a self-taught computer programmer. His supervisor discovered his interest and expertise with computers and he was promoted to "Director of Monitoring and Evaluation."

The Center purchased a new computer system in July 1991 and Lambie was given the task of modifying the software to suit the Center's purposes. The software was designed to be used by

an inpatient hospital, and the Center was an inpatient and out-patient psychiatric facility. There was testimony that the nearer the time came for the new system to go on-line, the more frustrated Lambie became with it. He told several people that he simply did not think the software was capable of being adapted to the center's demands. From the testimony of various witnesses, it appears that Lambie took all fault for this upon himself rather than placing it where it belonged on the computer software company that had developed it and assured the State purchasers that it could be adapted to the Center's requirements.

Mrs. Lambie, a school teacher and counselor, testified that the family had taken a vacation to Disney World over the Christmas holidays, and she and Mr. Lambie had gone back to work on January 2, 1992. She said the next entire week Lambie worked day and night trying to get the computer software operating. He had a computer at home that was compatible with his computer at work and frequently stayed up until two or three a.m. working on it or would get up very early in the morning and start working on the computer. Then, no matter how late he had been up the night before, he left for the office at 7:30 a.m. On Thursday night Lambie stayed late at the office because "the Little Rock people" were still there.

On Friday and Saturday of that week Mr. Lambie was scheduled to be in meetings in Little Rock. Friday morning he got up at three or three-thirty a.m. (Mrs. Lambie was really not sure he ever went to bed) and was in Little Rock before eight. Mrs. Lambie and her daughter went to spend the weekend with her parents near Walnut Ridge. Mr. Lambie called his wife on Friday night and told her to have her mother get Mrs. Lambie's name off all her mother's bank accounts because he might get sued. Mr. Lambie called his supervisor, the Center's administrator, Bonnie White, twice that Friday and told her he just did not think this computer program would ever work for the Center.

Mr. Lambie checked out of the hotel in Little Rock at 2:56 a.m. on Saturday, January 11, 1992. As he drove home he made a tape recording for his wife, daughter, family and friends. It was clearly a suicide note. When he arrived home, he parked the car cross-ways in the driveway, and taped a note on the passenger side window which stated: "Elaine, I am in the back yard. Don't you

or Elizabeth come around. I Love you both," signed "Mike." The evidence is contradictory whether the tape recording and a note to "Rewind and Play" was in the house on the bar beside a gun case or on the windshield of the car. Lambie's body was discovered at 9:40 a.m. by a meter reader. Lambie had a fatal gunshot wound to the head. A .38 caliber revolver was near the body.

Bonnie White testified that Lambie was an ideal employee for any administrator. He was a perfectionist, with skills and a commitment to work that is not routinely found in people. She said when she thought Lambie had done an excellent job on something it wasn't good enough for Lambie. She said he would keep perfecting it and eventually bring to her work that was outstanding. Ms. White testified that as the time neared for the computer system to "go live," Lambie exhibited more and more signs of stress. She described an event that happened approximately six weeks prior to Lambie's death when he thought he had improperly certified some paraprofessionals and over-charged Medicaid. Ms. White said he was extremely agitated and kept saying it was "terrible" when she tried to assure him that, even if an error had been made, it could be corrected and it was not that serious. She said he was extremely relieved when he found out that he had not made an error.

On the Friday before his death, Ms. White said when she got to work just before eight, Lambie had already called her from Little Rock. He called again at five minutes until eight and was talking in a whisper. She said he expressed the opinion that the system would not work for the Center and she detected that he was blaming himself. He said, "I am to blame." She reiterated to him that he was not to blame; if anyone was to blame, it was the corporation who assured them the program would fit their needs. Ms. White said she then contacted Joy Mills in Little Rock and asked her to talk to Lambie and assure him he was not to blame for the problems with the software. Ms. White said she talked to Lambie again about one that afternoon and he was still blaming himself. Ms. Mills was to talk to him later in the afternoon. That was the last time Ms. White heard from Lambie. She said she was unaware of any other stressors in Lambie's life; he was known by his peers as one who had everything good in his life. Ms. White said after listening to the tape there was no doubt in her mind why Lambie took his life, "The stress of his work."

Dale Christian, the Director of Financial Management at George W. Jackson Mental Health Center, testified that he worked closely with Lambie for five years and was working with the same computer program in terms of the financial input and output of the system. He described Lambie as, "one of the most serious minded people that I ever met. He was very dedicated and [a] hard worker and one of the most intelligent people that I ever met." He also said of Lambie:

> He was very frustrated by the fact that the SMS system is designed for an acute care general hospital setting, and we were having to modify it to fit an inpatient psychiatric setting and an outpatient psychi-atric setting and those modifications were extremely difficult.

Christian testified that he was scheduled to be in Little Rock for the weekend meeting and arrived sometime around five on Friday afternoon. When he got to the meeting Saturday morning someone gave him a list that Lambie had prepared for him that detailed the problems with the computer system. Christian said the list was readable, understandable, rational and identified concrete problems in the system that had to be worked out.

Joyce Mills, Assistant Director of the Division of Mental Health, testified that she was in charge of all administrative services, including computer systems, finance, accounting, budget and personnel. Gene Brown, the project director for the whole division for the SMS computer system implementation, worked directly for her. She said she knew Mr. Lambie and had worked a good bit with him but until the day before his death, she had never been aware that he was under any particularly unusual degree of stress because of the project. On that day she, Brown and several other people, including a representative of the computer company that designed the SMS system, met with Lambie and discussed the concerns he had about the system. She said Lambie's concerns were practical and she thought they had come up with workable solutions to them. Ms. Mills said she saw no indication that Lambie was not in a rational frame of mind and thought when the meeting was over; he seemed to feel better about the project. She was surprised when she heard of Lambie's suicide.

The Commission stated that it had previously "adopted

the test that compensation will be awarded if there is an unbroken chain of causation between the compensable physical injury and the suicide." "In other words," the Commission said, "the question is whether the act of suicide was an independent intervening cause breaking the chain of causation between the initial injury and the death or whether the suicide was in the direct line of causation." Many jurisdictions have adopted the "chain of causation" test, which, according to 1A Arthur Larson, *The Law of Workmen's Compensation* §36.30 (1990), holds that the intervening cause issue turns not on the employee's knowledge that he is killing himself, but rather on the existence of an unbroken chain of causation from the injury to the suicide.

In the instant case there was no physical compensable injury. Nevertheless, the Commission allowed benefits, holding that because the job stress was "a substantially contributory, if not, in fact, the sole, cause of decedent's suicide," and there would not have been a suicide without the job stress, there was "no independent intervening cause breaking the chain of causation between the stress experienced by the decedent as a result of his employment and his suicide."

Appellant, Public Employees Claims Division, argues that the Commission erred in finding that the decedent's suicide arose out of, and in the course of, his employment. Appellant emphasizes that to prove a compensable stress injury the employee is required to show that he was subjected to stress of a different quality than other, similarly-situated employees, and that such stress would have been likely to have produced a stress illness in anyone. *See Owens* v. *National Health Laboratories, Inc.*, 8 Ark. App. 92, 648 S.W.2d 829 (1983). It contends the job Lambie was doing was similar to that being done by other administrative personnel within the Arkansas Division of Mental Health Services and, although Lambie's reaction to his job stress was "obviously excessive," it had much more to do with his personality than his job.

■■ The appellant also argues that it makes no difference that job stress caused the suicide; since the decedent did not have a prior physical compensable injury, his widow cannot recover benefits for his suicide. 1A Arthur Larson, *The Law of Workmen's Compensation* § 36.40 (1990) states:

Although it is sometimes said that the suicide must stem from a "compensable physical injury," this statement is unduly restrictive. The correct statement is that the suicide must be the result of some injury arising out of and in the course of employment. In other words, at the very outset there must be found an injury which itself arose out of and in the course of employment, and then the suicide must be traced directly to it. If there is no such employment connected injury setting in motion the causal sequence leading to the suicide, or when there are far stronger non-employment influences accounting for the suicide, the suicide is a complete defense.

. . . .

At this writing, there are relatively few such examples of suicide preceded by no definite physical injury. But the rapid development of the field of compensation for nervous and mental disorders suggests that as cases arise of suicide following upon mental or nervous injury, awards will not be refused merely for lack of evidence of a compensable physical injury at some point.

The record is replete with evidence that Lambie took his own life because of job-related stress and there is nothing in the record indicating any other possible reason for his suicide. The testimony revealed that just before his death, this superior employee was reduced to a state of hopelessness. The Commission found that the cause of Lambie's suicide was stress arising out of and in the course of his employment, and we cannot say its decision is not based on substantial evidence.

Appellant also argues that the Commission erred in holding that this claim is not barred by Ark. Code Ann. § 11-9-401(a)(2). Appellant acknowledges that section (a)(1) of this statute provides for the general obligation to pay compensation for work-related injury or death. However, according to appellant, the next section, (a)(2), "creates a clear exception in certain cases which would otherwise be compensable; i.e. the legislature obviously intended to deny compensability for intentionally self-inflicted deaths or injuries, even where they arose out of, and in the course, of employment."

Appellant maintains that Lambie was acting in a rational manner during the last hours of his life: He had attended meetings about the computer system where problems and possible solutions were discussed; he left a detailed and accurate list of problems which needed to be corrected for a colleague; he checked out of his hotel in Little Rock and returned to Jonesboro; he took care to protect his family from discovering his body; and he left instructions about returning the State property in his possession. It is appellant's position that since Lambie took steps to protect his family and the employer from the detrimental effects of his suicide, Lambie had the required knowledge and intention to come within the exclusion of Ark. Code Ann. § 11-9-401(a)(2).

 The Commission found this argument to be unpersuasive, and so do we. Quoting from 1A Arthur Larson, *The Law of Workmen's Compensation*, § 36.30 it stated:

> [T]he intervening cause issue turns not on the employee's knowledge that he is killing himself, but rather on the existence of an unbroken chain of causation from the injury to the suicide. . . . [I]f the first cause produces the second cause, the second cause is not an independent intervening cause. The question whether the actor appreciated the consequences of his act should not be decisive on the fundamental question whether that act was the natural and foreseeable result of the first injury.

The Commission held that because it was clear that if it had not been for the stress placed on Lambie of trying to adapt an unworkable computer software program to his employer's requirements, there would have been no suicide, there was no independent intervening cause breaking the chain of causation between the stress Lambie experienced as a result of his employment and his suicide. We think this decision is supported by substantial evidence.

Affirmed.

JENNINGS, C.J., and ROGERS, J., agree.